(C. D. 456)

Distillers Co., Ltd. *v.* United States

United States Customs Court, Third Division

(Decided March 25, 1941)

*James W. Bevans* for the plaintiff.

*Charles D. Lawrence*, Acting Assistant Attorney General (*Joseph F. Donohue*, special attorney), for the defendant.

Before CLINE, EVANS, and KEEFE, Judges

EVANS, Judge: This is an action against the United States in which the plaintiff seeks a refund of money claimed to ·have been collected in excess of the amount due as customs duties upon importations of merchandise described on the invoices as "cinnamon flavouring extract" and "Noyeau flavouring extract." Duty was assessed thereon under the provisions of paragraph 802 of the Tariff Act of 1930 at the rate of $5 per proof gallon and an additional $2 per gallon under the Internal Revenue Act, in the case of protest 979725–G and $5 per proof gallon and $2.25 per gallon in the case of protest 991924–G. The protests were consolidated and tried together.

It is claimed by the plaintiff that the merchandise is covered by the Belgian Trade Agreement (T. D. 47600) which amended paragraph 24 of the Tariff Act of 1930, and that the only duty assessable is the rate therein provided, viz, 18 per centum ad valorem and 30 cents per pound.

The provisions of law claimed applicable are as follows:

PAR. 802. Brandy and other spirits manufactured or distilled from grain or other materials, cordials, liqueurs, arrack, absinthe, kirschwasser, ratafia, and bitters of all kinds containing spirits, and compounds and preparations of which distilled spirits are the component material of chief value and not specially provided for, $5 per proof gallon.

The Belgian Trade Agreement modified paragraph 24 of the act of 1930 as follows:

Flavoring extracts, and natural or synthetic fruit flavors, fruit esters, oils and essences, all the foregoing and their combinations, containing more than 20 per centum and not more than 50 per centum of alcohol, 30¢ lb. & 18% ad val.

Plaintiff introduced the testimony of Mr. Hugh Mair, who stated that he was works manager in charge of production of the importing corporation; that said importer is one of the subsidiaries of Distillers Co., Ltd., of Edinburgh, Scotland; that all of these companies manufacture the same brands of gin. This witness stated further that the imported merchandise was used "in conjunction with finished gin, to make a very slight change in the flavor"; that these companies use it in quantities not exceeding one-quarter of 1 per centum of each to the

bulk gin.    His description of the method of manufacture of two com-
modities is as follows:

Cinnamon extract is made from cinnamon bark, and one or two other lesser
ingredients, steeped in grain alcohol, grain neutral spirit and redistilled.    *    *    *
the grain alcohol after steeping the whole thing is put into the still and redistilled,
after it is a distillate.    *    *    *    The alcohol picks up the flavors and odors from
the cinnamon, and other ingredients in the still.

Noyeau is made principally from almond cake.    The almond cake is steeped in
water, the water is withdrawn and distilled.    Then grain spirit is added to that
water, along with one or two other lesser ingredients, and the whole is distilled
over, as in the case of the cinnamon.

The witness further stated that neither his company nor any of the
subsidiary companies sells these two commodities.    His opinion
based upon tasting the two exhibits was that they were very bitter
and unpleasant to the taste and therefore it was his opinion that they
could not be used for drinking purposes.    On cross-examination in
answer to a question of Government counsel he stated that in his
opinion the two commodities could not be consumed in the condition
in which they appear in the exhibits in evidence.

The Government produced two witnesses, one the chief chemist
in the United States Customs Laboratory at New York and the other
Mr. Sample, the chemist in charge of analyses of alcoholic compounds
and preparations in that laboratory, who made the analyses of the
exhibits here before us and whose experience in such work covered
15 years.    Mr. Sample testified that exhibit 1, the cinnamon extract,
showed upon analysis 28.6 per centum of absolute ethyl alcohol by
volume, and no appreciable amount of essential oil, or cinnamon oil,
and no injurious substances.    As to exhibit 2, the Noyeau extract,
he stated that it showed 28.4 per centum of absolute alcohol by volume,
and no appreciable quantities of essential oils.    Having made the
above findings he took up the question of how to report the same—we
assume for classification purposes—with Mr. McSorley, the chief
chemist.

This witness further testified that in addition to the analyses made
by him he tasted the exhibits and found that they were not unpalatable
to his taste, and that as he found no essential oils or ingredients that
might be injurious in them, he thereupon from taste alone concluded
there was nothing in them to prevent the use for beverage purposes.
He stated that it is part of his duties in examining articles like those
before us to determine whether or not they are potable; that by
potable he means there was nothing present in the liquors to make
them unfit for human consumption.    Based upon his experience in
examining various liquors in the course of his duties, he stated that
the alcoholic content of the samples together with the fact that he
could find no appreciable amount of essential oil in the samples

caused him to arrive at the conclusion that the commodities are fit for use for beverage purposes.

It further appeared from this witness's testimony that the quantity of essential oil present in cinnamon extract is 2 per centum or more and in the case of Noyeau Flavor not less than 1 per centum, and that with those essential oil contents approximately 60 per centum or more of alcohol would be necessary in order to maintain those respective oils in solution.

On cross-examination Mr. Sample stated that the Food and Drug Act fixes a minimum for essential oil content used in flavoring extracts and that the instant commodities contain less than that minimum quantity.

Mr. McSorley, the chief chemist in the United States Customs Laboratory, was also called by the Government. His experience extended over 23 years. His testimony was that he tasted the commodities as represented by the exhibits 1 and 2 and while they didn't taste as delectable as some other things he drinks, they didn't seem to be unfit for beverage use, and in the light of the analyses and his experience in testing the commodities his opinion was that they could be consumed—were potable.

This witness further testified that based upon his experience the normal percentage of essential oil contained in cinnamon extract is anywhere from 1½ to 2½ per centum, which would require about 60 per centum of alcohol to keep it in solution. With reference to the Noyeau Extract the usual percentage of essential oil contained therein is about 1 per centum, and that about 60 per centum of alcohol is necessary to keep that amount in solution. He also stated that in determining whether commodities submitted to him are flavoring extracts, he usually compares them with the Department of Agriculture Standards as found in the United States Department of Agriculture Food and Drug Administration Service and Regulatory Announcements, Food and Drug No. 2, dated November 5, 1936. This pamphlet was received in evidence over objection of plaintiff's counsel.

On cross-examination the witness admitted that he had had no commercial experience in the use of these particular commodities, and did not know how they were used.

To summarize, we have the testimony of one witness on behalf of the plaintiff describing the method of production and use of these commodities. This testimony was given by a commercial witness, and seems to bring the commodities within the dictionary definition of flavoring extract, which we find in Webster's New International Dictionary, Second Edition, as follows:

A solution in ethyl alcohol of proper strength of the sapid and odorous principles derived from an aromatic plant;  *  *  *.

From the Government standpoint it would appear that the question of whether this merchandise was taxable under the internal revenue act (liquor taxing act) or not depended largely upon whether it was fit for beverage purposes. That appears from the report of the assistant appraiser in a memorandum furnished the collector which is part of the official papers. The testimony of the Government chemists makes the point that the merchandise is potable and that they tasted some of it by drinking a small portion of it, which would indicate that they thought it taxable under paragraph 802 as a beverage and not under that portion of said paragraph which relates to "compounds and preparations of which distilled spirits are the component material of chief value and not specially provided for," assuming that the latter classification was intended to cover compounds and preparations of distilled spirits which were not beverages. On this phase of the question it is our opinion that the positive testimony of the plaintiff's witness to the effect that the commodities were manufactured to be used for flavoring purposes, that they are manufactured in the same manner as are flavoring extracts, and that they were actually used by the importing concern for the flavoring of gin, should have greater weight on the question as to whether these commodities are or could be used as beverages, than the casual testing by tasting made by the Government chemists. There is no testimony that they ever had been used as beverages and the plaintiff's witness gives it as his opinion that they could not be so used. So with this uncertain situation, so far as the evidence is concerned, we prefer to follow the more specific *eo nomine* designation found in paragraph 24, as modified by the Belgian Trade Agreement, for flavoring extracts. There being no definition of a flavoring extract in the tariff act, we hold that the fact that these commodities are not of the strength specified in the regulations under the Food and Drugs Act is not sufficient to exclude them from the aforesaid provision of the tariff act. If there is anything about the quality or strength that renders them not merchantable under the Food and Drugs Act, that pertains to another department of the Government.

We therefore find that the plaintiff's claim for assessment as flavoring extracts under paragraph 24 as modified by the Belgian Trade Agreement, viz, 30 cents per pound and 18 per centum ad valorem, should be and the same hereby is sustained.

As to the internal revenue tax we find that section 1150 (a) (3) of the liquor taxing act as codified in the United States Code, title 26, provides as follows:

(3) Products of distillation containing distilled spirits. All products of Distillation, by whatever name known, which contain distilled spirits or alcohol, on which the tax imposed by law has not been paid, shall be considered and taxed as distilled spirits. (R. S. section 3254).

The description of the method of manufacture of the instant commodities, *supra*, shows that they fall exactly within the above provision. The claim of the plaintiff that no internal revenue tax is assessable is therefore overruled.

Judgment will be rendered accordingly. It is so ordered.